**Sharon L. HUNTOON, Petitioner,**

v.

**TCI CABLEVISION OF COLORADO, INC., a Colorado corporation, Respondent.**

**No. 97SC480.**

Supreme Court of Colorado, En Banc.

Nov. 30, 1998.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, for Petitioner.

Purvis Gray Schuetze & Gordon, John A. Purvis, Glen F. Gordon, Boulder, for Petitioner.

Sherman & Howard L.L.C., Richard N. Baer, John W. Mill, John J. Cyran, Noel M. Franklin, Denver, for Respondent.

American Psychological Association, James L. McHugh, Jr., General Counsel, Nathalie Gilfoule, Washington D.C., Holme Roberts & Owen LLP, Boyd N. Boland, Laurence B. James, Denver, Jenner & Block, Kit A. Pierson, Paul M. Smith, Marc A. Goldman, Washington D.C., for Amici Curiae The American Psychological Association; The National Academy of Neuropsychology; The Colorado Psychological Association; and The Colorado Neuropsychological Society.

Justice MARTINEZ delivered the Opinion of the Court.

In this personal injury action brought by Sharon Huntoon against TCI Cablevision of Colorado, Inc. ("TCI") for injuries sustained in a rear-end automobile collision, we discuss the appropriate standards to resolve a mo-

tion for directed verdict and to admit specialized neuropsychologist testimony.[1] The court of appeals reversed a directed verdict for Huntoon on issues of liability because it found some evidence of comparative negligence. *See Huntoon v. TCI Cablevision,* 948 P.2d 33, 34 (Colo.App.1997). The court of appeals also found that the admission of neuropsychologist testimony regarding the cause of Huntoon's organic brain injury was erroneous, and ordered that similar testimony be prohibited at a new trial. *See id.* at 35.

In our view, the trial court properly directed a verdict on liability. Considering the evidentiary context, we find that the inference the court of appeals would have the jury indulge is not supported by the record. In addition, the court of appeals' opinion might be read to unjustifiably subject neuropsychologists to a level of scrutiny different than that applied to all other experts under CRE 702. Colorado law supports no such distinction. We therefore reverse the decision of the court of appeals.

## I.

On October 15, 1992, Sharon Huntoon was stopped on University Avenue in Boulder when a truck owned by TCI and driven by a TCI employee struck her 1982 Subaru from behind. The impact caused Huntoon's Subaru to be pushed forward, where it came into contact with a Cadillac Seville driven by Diana Kahn, who had apparently stopped to wait for a car in front of her that was impeding the flow of traffic. While Kahn stated that the car before her was slowly pulling into a diagonal parking place to the right, the TCI employee testified that he remembered seeing reverse lights and believed the car was backing out. Huntoon testified that she

did not remember whether the car in front of Kahn was pulling in or out.

Huntoon did testify, however, that she was aware of activity taking place in the roadway and stopped her Subaru when she saw Kahn's Cadillac Seville stop in front of her. Huntoon originally thought it could have been as long as a minute from the moment she stopped until the TCI truck struck her vehicle. However, she conceded she may have been mistaken in light of Kahn's testimony that only five to ten seconds elapsed before the impact.

The TCI driver gave testimony to the effect that he first noticed the back-up lights of the car in front of Kahn, followed by both Kahn and Huntoon's brake lights. He explained that he saw the rear of Huntoon's Subaru "hunch up" and forcefully applied his brakes, but was unable to stop in time to avert a collision. The TCI employee testified that he was partly at fault because he failed to avoid the accident, and that Kahn was also at fault for stopping suddenly.[2] He acknowledged that there was nothing Huntoon could have done to avoid being hit.

Police officers investigating the accident found some thirteen feet of skid marks attributable to the TCI vehicle. No marks were left by either the Huntoon or Kahn automobiles. Testimony indicated TCI's internal investigation found its driver to have been at fault, and this employee was placed on probation at work as a result.[3] Witnesses also confirmed that TCI paid for the damage to both the Huntoon and Kahn vehicles.[4]

Although Huntoon told an investigating officer that she was experiencing pain, she initially refused medical assistance. However, she continued to experience physical dis-

---

**1.** We granted certiorari on the following two issues:

Is a neuropsychologist unqualified as a matter of law to testify about causation of brain injuries? Did the district court err in entering a directed verdict for the plaintiff on the defendant's affirmative defense of comparative negligence when the plaintiff was waiting for a vehicle in front of her to park and the defendant drove a truck into the rear end of the plaintiff's car?

**2.** TCI originally filed a designation of non-party liability alleging that Kahn herself had backed

out of a parking space in front of Huntoon, thereby creating a sudden emergency. At trial, the TCI driver acknowledged this was incorrect.

**3.** The TCI investigation did not consider the relative fault, if any, attributable to Huntoon or Kahn.

**4.** Huntoon's auto insurance carrier deemed her Subaru was damaged beyond repair, and a total loss.

comfort and subsequently began having difficulties with short-term memory and other cognitive abilities. Huntoon was eventually diagnosed with cognitive dysfunction, including difficulties with completion of tasks, attention to detail, and interaction with others.

Dennis McCarthy, Ph.D., a neuropsychologist involved in Huntoon's post-accident treatment regimen, was one of several professionals called to testify during her case in chief. He explained that neuropsychologists perform the "study of brain behavior relationships and use a battery of psychological and neuropsychological tests that are standardized in order to elicit observations of relevancy of various aspects of the brain in terms of cognitive and intellectual function." Dr. McCarthy also related his educational history, which consisted of three degrees in psychology, a master's and doctoral degree, and post-doctoral training – including coursework and understudy – in the field of neuropsychology.

Dr. McCarthy stated that he gave Huntoon an extensive series of neuropsychological tests and analyzed the results. The eight to ten hour assessment included an extensive clinical interview designed to provide a detailed life history.

When Dr. McCarthy was asked for his opinion on the relation between Huntoon's injuries and the accident, TCI objected, arguing:

> This witness has not been qualified as a medical doctor and to the extent that [counsel] is asking him to render an opinion as to brain injury, which is a physical manifestation, which is a result of neuropsychological testing, so we would object.

The trial court initially sustained the objection on the basis of insufficient foundation. Huntoon's counsel then asked a series of questions which allowed Dr. McCarthy to relate the extent to which test results allow

neuropsychologists to diagnose and treat organic brain injury.[5] He was again asked to discuss his findings with regard to the brain injuries Huntoon suffered from the October 15 accident. TCI renewed its objection, insisting "[t]his expert is not qualified to testify as to the causation of brain injury as opposed to, for example, cognitive impairment as related to neuropsychological testing." The trial court overruled the objection, and Dr. McCarthy was allowed to answer. He testified that there was injury to the brain and he identified several areas of the brain where there was continuing impairment.

At the close of the evidence, the trial court directed a verdict in favor of Huntoon on the issue of liability, finding the TCI employee negligent, and the evidence introduced at trial insufficient to establish negligence on the part of Huntoon or Kahn.[6] The jury awarded damages.

The court of appeals reversed. It found that the trial court erred by directing the verdict on liability because the evidence, viewed in the light most favorable to TCI, was such that "a jury could find that a portion of fault lay with [Huntoon]." *Huntoon*, 948 P.2d at 34. It therefore remanded the case for a new trial.

The court of appeals also addressed TCI's assertion that Dr. McCarthy, the neuropsychologist, should not have been allowed to testify as to the causation of Huntoon's organic brain injury. Finding the "clear import" of the testimony to touch upon the issue of causation, the court stated, "no authority in Colorado allows a neuropsychologist to testify to the physical cause of organic brain injury." *Id.* at 35.

Because we agree with the trial court that the evidence was insufficient to submit a theory of comparative negligence to the jury, and because we find no abuse of discretion in the admission of neuropsychologist testimony on issues of causation, we now reverse the judgment of the court of appeals.

---

5.   In this regard, Dr. McCarthy stated, in part:

[N]europsychological testing can and does allow the diagnosis of the presence, or rule out on the other hand brain impairment, brain damage, that kind of thing and then, of course, it allows – a battery allows you not only to make statements

about the diagnosis, but certainly to formulate treatment. . . .

6.   TCI did not seek review of the trial court's ruling as to Kahn's lack of negligence before the court of appeals, and thus, we do not consider that issue here.

## II.

Huntoon argues that the court of appeals applied the wrong standard in its analysis of the directed verdict in this case, and that the evidence before the trial court was simply insufficient to support an inference of comparative negligence. TCI contends that the court of appeals employed an appropriate standard, and that the record contains facts sufficient to allow a jury to entertain a theory of comparative negligence. We are of the view that the court of appeals should have let the directed verdict stand.

### A.

We turn first to the standards governing a motion for directed verdict. The court of appeals pronounced that "the evidence supporting a directed verdict must do more than contradict conflicting evidence; it must *nullify* such evidence." *Huntoon*, 948 P.2d. at 34 (emphasis added). The court cited our decision in *Gossard v. Watson*, 122 Colo. 271, 221 P.2d 353 (1950), as the basis for its nullification language. Huntoon suggests that *Gossard* has been displaced by our articulation of the directed verdict standard in more recent decisions. *See, e.g., Gorab v. Zook*, 943 P.2d 423, 426–27 (Colo.1997) ("A motion for directed verdict should not be granted unless the evidence compels the conclusion that a reasonable factfinder could not disagree and that no evidence or inference has been presented at trial upon which a verdict against the moving party could be sustained.").

Although the nullification language in *Gossard* is not useful to analyze the evidence in this case, the law has not changed. Rather, the difference between *Gossard* and *Gorab* is explained by considering the evidentiary context in which the directed verdict motions were made.

In *Gossard*, the trial court had heard contradictory testimony on issues related to liability when it was presented with a motion for directed verdict by the defendant. *See Gossard*, 122 Colo. at 274, 221 P.2d at 354. We found it notable that the non-movant plaintiff had presented testimony sufficient in itself to establish a prima facie case of liability on the part of the defendant. In that context, we held the defendant would be entitled to a directed verdict only if its evidence nullified the testimony supporting the plaintiff's prima facie showing. *See id.*

In *Gorab*, the evidentiary posture of the parties was slightly different. There, the plaintiff patient alleged his physician had breached the doctrine of informed consent. *See Gorab*, 943 P.2d at 425. The defendant physician presented evidence that his disclosures were sufficient under the appropriate medical standards, and the plaintiff did not present evidence rebutting this showing – as is required to create a jury question under the shifting burden analysis applicable to informed consent claims. *See id.* Because the plaintiff had not presented such rebuttal evidence, he could not have sustained a jury verdict in his favor. We did not delve into a discussion of whether the defendant physician would be required to nullify the plaintiff's evidence, because there was no rebuttal testimony for that movant to nullify.

When the evidence establishes a prima facie case but conflicting evidence would lead to a contrary result, the nullification language of *Gossard* properly conveys the requirements for a party to succeed on a motion for directed verdict. However, where the law demands evidence of a certain nature to create issues of fact for the jury, as in *Gorab*, the nullification analysis need not be reached to evaluate whether that evidence is sufficient. Thus, while the articulations in these cases may appear to be divergent, each is consistent with the general framework we have set forth for directed verdict analysis.

It is axiomatic that a directed verdict should only be granted in the clearest of cases. *See Jorgensen v. Heinz*, 847 P.2d 181, 182 (Colo.App.1992). A court considering such a motion must view the evidence and all reasonable inferences arising legitimately therefrom in the light most favorable to the non-movant. *See Fair v. Red Lion Inn*, 943 P.2d 431, 436 (Colo.1997); *Palmer v. A.H. Robins Co.*, 684 P.2d 187, 218 (Colo.1984). If the evidence when viewed in this light is simply unable to support a verdict in favor of the non-moving party, the issue in question should not be submitted to a jury. In such circumstances, a directed verdict may and

should be entered. *See Fair,* 943 P.2d at 437.

## B.

Having noted that our view of the law governing directed verdicts remains unchanged, we now discuss the evidence required to support a theory of comparative negligence in a rear-end collision.

�In Colorado's comparative negligence statute, *see* § 13–21–111, 5 C.R.S (1998), requires a jury to apportion the relative percentages of fault attributable to the plaintiff and the defendant in cases where there is evidence the plaintiff was responsible, in some part, for the injuries sustained. However, where there is no evidence in the record that could support a finding of negligence on the part of the plaintiff, it is reversible error to submit the question of comparative negligence to the jury. *See Powell v. City of Ouray,* 32 Colo.App. 44, 49, 507 P.2d 1101, 1105 (1973).

▐ In a rear-end collision, the driver who overtakes and collides with a car stopped ahead on the roadway is presumed negligent. *See, e.g., Gaulin v. Templin,* 162 Colo. 55, 59, 424 P.2d 377, 379 (1967); *Iacino v. Brown,* 121 Colo. 450, 454, 217 P.2d 266, 268 (1950). This presumption may be rebutted by evidence tending to show that the negligence of the driver in front caused the damages. *See, e.g., Gordon v. Benson,* 925 P.2d 775, 777–80 (Colo.1996) (testimony indicated plaintiff may have backed her vehicle into defendant).

▐ Where the theory of comparative negligence is that the driver in front stopped suddenly, the law also requires evidence that the stop was unwarranted. *See Gaulin,* 162 Colo. at 59, 424 P.2d at 379 (inference driver in front was negligent may arise where "the lead vehicle makes a sudden and abrupt stop under circumstances which a court or jury might find to be unwarranted"). As such, it is not enough to merely show that the stop in question may have been sudden. *See Dilts v. Baker,* 162 Colo. 568, 571, 427 P.2d 882, 884 (1967); *Churning v. Staples,* 628 P.2d 180, 181 (Colo.App.1981); *Moore v. Fischer,* 31 Colo.App. 425, 429–30, 505 P.2d 383, 386

(1972), *aff'd on other grounds,* 183 Colo. 392, 517 P.2d 458 (1973).

▐ A sudden stop may be unwarranted if the evidence suggests it was made without reason, or in an unexpected and uncalled-for location. *See Miller v. Dewey,* 170 Colo. 460, 462, 462 P.2d 485, 485–86 (1969) (testimony indicated driver stopped suddenly, without signaling, and for no apparent reason as there were no cars stopped in front of her); *Hildyard v. Western Fasteners, Inc.,* 33 Colo.App. 396, 402–03, 522 P.2d 596, 599 (1974) (testimony suggested preceding driver stopped for red light suddenly and in an unexpected location, possibly one and a half car lengths back from the cross-walk). Thus, even if the evidence before the trial court in the instant case supported an inference Huntoon stopped suddenly, TCI's theory of comparative negligence could not go to the jury unless the evidence would also allow a jury to rationally and legitimately conclude the stop was unwarranted.

## C.

▐ The court of appeals found an inference of comparative negligence based on (1) testimony that the rear of Huntoon's Subaru "hunch[ed] up;" (2) the inconsistency between Huntoon and Kahn's testimony as to the length of time that had elapsed before the impact from the TCI vehicle; and (3) testimony by Huntoon to the effect that she was "not really paying attention." *Huntoon,* 948 P.2d at 35. Huntoon insists these points cannot establish comparative negligence in the context of the presumption fashioned by the law governing rear-end collisions. We agree.

While testimony by the TCI driver that the Huntoon automobile appeared to "hunch up" supports an inference the stop was in some part sudden, it does not address whether the stop was unwarranted under the circumstances. As noted, evidence that a stop was sudden, standing alone, will not justify sending the issue of comparative negligence to the jury. *See Churning,* 628 P.2d at 181; *Moore,* 31 Colo.App. at 429–30, 505 P.2d at 386.

We also find that reliance upon the different intervals stated by Kahn and Huntoon with respect to the time between their stops and the impact by the TCI vehicle is misplaced. Directed verdict analysis presumes that the jury would disregard all testimony contrary to the position advocated by TCI. But Kahn's testimony that only five to ten seconds elapsed from the time she stopped until the TCI truck pushed Huntoon's Subaru into her vehicle is not evidence from which one can conclude that Huntoon's stop was unwarranted.

Finally, we disagree with the court of appeals' characterization of the record when it states "plaintiff [Huntoon] testified she was 'not really paying attention' to the activity on the street at the time of the accident." *Huntoon*, 948 P.2d at 35. Apparently, the court of appeals is referring to the following exchange:

Q: Do you know why Ms. Kahn came to a stop?

A: I remember she was stopping because there was some activity because I wasn't paying attention because it was a normal day. So I wasn't thinking I would have to remember what was going on, so I stopped because something was happening in front of – someone was going in or out, but I don't remember which way.

For the purposes of directed verdict analysis, we do not consider Huntoon's further testimony that she saw "activity" in front of Kahn, knew it had something to do with a vehicle pulling in or out of a parking space, and brought her own vehicle to a gradual stop. *See Gordon*, 925 P.2d at 778 (courts must assume jury could disbelieve all or part of witness' testimony). We also ignore the testimony of the TCI employee admitting he was at least partially at fault, and his concession that Huntoon could have done nothing to avoid the accident, as such admissions do not conclusively eliminate the possibility of negligence on the part of the preceding driver. *See Gaulin*, 162 Colo. at 58, 424 P.2d at 378 (concluding "[s]uch testimony does not bar the affirmative defense of contributory negligence").

Even when viewing the evidence in this light, we are persuaded the trial court was correct when it ruled that the testimony could support only a legitimate inference that Huntoon was not paying attention to whether the driver in front of Kahn was pulling in or out of the parking space in question. Although a driver ignoring the roadway while preoccupied by some other distraction and stopping suddenly at the last possible moment might be comparatively negligent, the record does not support such a finding here. If the testimony could potentially lead to that conclusion, the issue would have to be submitted to the jury for a determination of whether the stop was unwarranted given those circumstances. In this case, however, Huntoon's testimony failed to raise the inference that she was inattentive as to anything beyond whether the vehicle in front of Kahn was pulling in or out.

It was not necessary to submit a theory of comparative negligence to the jury based on the points highlighted by the court of appeals. In our view, the evidence viewed in the light most favorable to TCI supports an inference that Huntoon's stop might have been sudden, but not that it was unwarranted. Accordingly, we conclude the trial court did not err by directing a verdict for Huntoon on issues of liability.

### III.

It is unclear whether the court of appeals viewed the admission of testimony from neuropsychologist Dr. McCarthy as sufficient, standing alone, to require reversal. The court addressed the issue as one "concerning both liability and damages that may arise on retrial," *Huntoon*, 948 P.2d at 35, but clearly held the trial court's handling of the matter to be erroneous. We therefore proceed to address the issue here.

Huntoon argues the court of appeals created a new rule in Colorado: Neuropsychologists, as a class, may not testify about the physical causation of organic brain injury. She asserts the court of appeals' analysis of the issue undermines the operation of CRE 702, and can be construed to limit testimony on certain issues only to licensed professionals. TCI defends the court of appeals' decision on several grounds. It asserts that the

opinion is not so remarkable, and should not be read as a categorical prohibition of neuropsychologist testimony. Instead, TCI suggests we construe the court of appeals' decision as holding that an insufficient foundation had been laid to permit this particular professional to speak to the jury on the causation issues presented by this case.

## A.

We turn first to TCI's contention that the court of appeals' opinion should not be read as the broad prohibition Huntoon suggests it is. While we are inclined to view the decision narrowly, the court of appeals referred to neuropsychologists as a group, and not to the qualifications of the particular neuropsychologist before the trial court in this case.

The court of appeals cited its decision in *Gast v. City of Fountain*, 870 P.2d 506 (Colo. App.1993), *rev'd on other grounds*, 904 P.2d 478 (Colo.1995), for the proposition that a properly qualified neuropsychologist could opine on the *existence* of organic brain injury. It went on to note, however, that "no authority in Colorado allows a neuropsychologist to testify to the physical cause of organic brain injury." *Huntoon*, 948 P.2d at 35. This statement speaks to all members of the profession, and not solely to the expertise of the particular neuropsychologist, Dr. McCarthy, who testified regarding Huntoon's injuries.

The court then explained that "[o]ther jurisdictions which have addressed this question have held that a neuropsychologist may not opine concerning the physical cause of brain injury" because "psychologists are not medical doctors trained in the physiological aspects of the human body." *Id.* The cases cited by the court of appeals support the blanket exclusion of testimony on causal relationships by psychology professionals. *See Bilbrey v. Industrial Comm'n*, 27 Ariz.App. 473, 556 P.2d 27 (Ariz.App.1976) (ruling subsequently superseded by statute, as recognized in *Hooper v. Industrial Comm'n*, 126 Ariz. 586, 617 P.2d 538 (Ariz.App.1980)); *Ex-*ecutive Car & Truck Leasing, Inc. v. DeSerio*, 468 So.2d 1027, 1029–30 (Fla.App.1985); *Chandler Exterminators, Inc. v. Morris*, 262 Ga. 257, 416 S.E.2d 277 (Ga.1992) (ruling subsequently superseded by statute).[7]

Finally, the objection made by counsel for TCI at trial was that Dr. McCarthy was not "a medical doctor," and therefore could not be allowed to "testify as to the causation of brain injury as opposed to ... cognitive impairment."

■ In light of the above, the court of appeals' decision could be read as holding that neuropsychologists lack the qualifications to opine on the physical cause of organic brain injury as a matter of law. As such, we deem it important to comment on whether such a categorical exclusion is proper. Contrary to the court of appeals' decision, we conclude that neuropsychologists are not per se unqualified to speak on the causation of organic brain injury. Instead, the propriety of such testimony is determined by using the same CRE 702 analysis applicable to all other experts.

■ The language of CRE 702 implicates a two-part approach to questions arising under the rule. The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Thus, a court must first determine whether the proffered expert testimony will be helpful to a trier of fact in the understanding of evidence or resolution of a fact at issue in the case. *See Melville v. Southward*, 791 P.2d 383, 387 (Colo.1990). A court must next review the qualifications of the witness, and determine whether a showing of "knowledge, skill, experience, training, or education" has been made sufficient to support testimony in the form of an expert opinion. CRE 702.

7. Like the *Chandler* and *Bilbrey* courts, our court of appeals engaged in a comparison between the statutes defining the practices of medicine and psychology, speaking not to Dr. McCarthy's specific qualifications, but in terms of those exhibited by the "disciplines" in question. *See Huntoon*, 948 P.2d at 35.

An expert opinion is helpful to the trier of fact if it embraces a relevant matter outside the understanding of the typical juror. To a large extent, this aspect of CRE 702 involves an inquiry as to "whether the untrained [layperson] would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved." *People v. Williams*, 790 P.2d 796, 798 (Colo. 1990).

A witness may be qualified by virtue of any one of the five factors specified in the rule. *See Colorado Arlberg Club v. Board of Assessment Appeals*, 719 P.2d 371, 374 (Colo.App.1986), *rev'd on other grounds*, 762 P.2d 146 (Colo.1988). There is no requirement that a witness hold a specific degree, training certificate, accreditation, or membership in a professional organization, in order to testify on a particular issue. *See White v. People*, 175 Colo. 119, 122, 486 P.2d 4, 6 (1971) (witness not disqualified by lack of college degree);[8] *Klein v. State Farm Mut. Auto. Ins. Co.*, 948 P.2d 43, 49–50 (Colo.App. 1997) (although not a chiropractor and uncertified on the equipment used by patient, osteopath could testify on occupational therapy issues); *Corcoran v. Sanner*, 854 P.2d 1376, 1381–82 (Colo.App.1993) (architect not licensed in this state not barred from testifying); *Colorado Arlberg Club*, 719 P.2d at 374 (appraiser not unqualified simply because he lacked particular professional designation).

The idea that neuropsychologists, as a group, lack the competence necessary to testify on the causation of organic brain injury is the minority view. As the court of appeals noted, the rationale for such a prohibition is the idea that psychologists are not medical doctors trained in the physiological aspects of the human body. *See Huntoon*, 948 P.2d at 35; *see also Bilbrey*, 556 P.2d at 29; *DeSerio*, 468 So.2d at 1029; *Chandler Exterminators*, 416 S.E.2d at 278. In addition, some courts have restricted such testimony on the basis that to do otherwise would allow psychologists to invade the realm reserved for

the practice of medicine. *See, e.g., Martin v. Benson*, 125 N.C.App. 330, 481 S.E.2d 292, 296 (N.C.App.1997), *rev'd*, 348 N.C. 684, 500 S.E.2d 664 (N.C.1998) (issue not properly preserved for appeal).

The majority of jurisdictions, however, have found that neuropsychologists may, with the proper foundation, opine on the physical cause of organic brain injury. *See, e.g., Valiulis v. Scheffels*, 191 Ill.App.3d 775, 138 Ill.Dec. 668, 547 N.E.2d 1289, 1296–97 (Ill.App.1989); *Landers v. Chrysler Corp.*, 963 S.W.2d 275, 280 (Mo.Ct.App.1997); *Adamson v. Chiovaro*, 308 N.J.Super. 70, 705 A.2d 402, 405–06 (N.J.Super.App.Div.1998); *Sanchez v. Derby*, 230 Neb. 782, 433 N.W.2d 523, 525–26 (Neb.1989). Most of the cases adopting the majority position choose to analyze the propriety of such testimony under the standard rules governing expert witnesses.

In our view, this approach is persuasive. We can find no compelling reason for the law to single out a particular class of professionals and categorically bar them from expressing opinions on matters that may well be within their expertise. We therefore join the majority of states that have resisted the creation of artificial barriers to the admission of expert testimony by drawing lines between the various professions, and we continue to require such witnesses to be measured under the well established parameters of CRE 702.

### B.

The initial determination of whether a witness is sufficiently qualified to render an expert opinion helpful to the jury is left to the sound discretion of the trial court, and may not be disturbed "without a clear showing of an abuse of discretion." *White*, 175 Colo. at 122, 486 P.2d at 6; *see People v. Williams*, 790 P.2d 796, 798 (Colo. 1990). A court abuses its discretion only if, under the circumstances, its ruling is manifestly arbitrary, unreasonable, or unfair. *See King v. People*, 785 P.2d 596, 603 (Colo.1990).

---

**8.** Although *White* was decided before the adoption of the Colorado Rules of Evidence, the court of appeals has properly found the reasoning in that case applicable to the analysis of CRE 702. *See Colorado Arlberg Club*, 719 P.2d at 374.

We cannot say the trial court abused its discretion by admitting the testimony of Dr. McCarthy on issues of causation. This witness had an extensive educational background, including three degrees in psychology, master's and doctoral degrees, and further study in neuropsychology including understudy with experienced neuropsychologists. The tests administered to Huntoon were extensive, and part of a standardized battery described as the most respected and widely documented in the neuropsychology profession. Moreover, Dr. McCarthy testified that he prepared a far-reaching background and case history to use as a backdrop for his analysis of the test results.

Dr. McCarthy gave an explanation of the way in which neuropsychological testing reveals the impact of an injurious event on an individual's ability to carry out every day activities, and the manner in which neuropsychologists use the tests and other clinical data to diagnose brain injury as manifested by cognitive impairment. Given this background, we think a trial court could legitimately conclude that Dr. McCarthy had demonstrated the knowledge and experience necessary to render an expert opinion as a neuropsychologist, and that he did not exceed the scope of his expertise by addressing issues of causation.

TCI argues there had been no pre-accident testing to establish a baseline against which to compare Huntoon's results on the neuropsychological battery. TCI also complains that the personal history obtained from Huntoon, and relied upon by Dr. McCarthy, did not disclose a prior auto accident and other background information that may have been relevant to her condition. Such matters, however, do not render the statements of the witness inadmissible, but go instead to the weight, if any, the jury might attribute to such testimony. *See Klein*, 948 P.2d at 50. Indeed, TCI properly brought these and other points affecting the weight of Dr. McCarthy's testimony to the attention of the jury by way of cross-examination.

Finding no abuse of discretion by the trial court, we conclude that the testimony of Dr. McCarthy was properly before the jury, and the court of appeals was in error when it held otherwise.

## IV.

We hold that the trial court properly directed a verdict on the issue of liability in this case. We also hold that the trial court did not abuse its discretion by admitting the testimony of the neuropsychologist. Accordingly, we reverse the judgment of the court of appeals and remand this case with directions to reinstate the trial court's judgment and the jury's award of damages.