No. 15,945.

SWAIM *v.* SWANSON ET AL.
(197 P. [2d] 624)

Decided September 13, 1948.

Mr. CLARENCE O. MOORE, for plaintiff in error.

Mr. THORNTON H. THOMAS, JR., for defendants in error.

*In Department.*

MR. JUSTICE JACKSON delivered the opinion of the court.

IN an action for adjudication of the right of possession to real estate and for damages for alleged wrongful trespass, defendants in error, plaintiffs in the trial court, recovered judgment in a jury trial awarding to them the right to exclusive possession of 160 acres of land in Kit Carson county and $850 damages. The parties will be referred to as they appeared in the trial court.

Counsel for defendant argues his ten specifications of error under four headings. He first takes the position that a notice to quit was a necessary precedent to the right to bring an action to dispossess, and that the trial court's failure to so instruct the jury was error. It is argued that defendant was a tenant from year to year,

holding over after the termination of his lease, and that he comes within the provisions of subsection 3 of section 4, chapter 70, '35 C.S.A.; that under the provisions of section 7 of that chapter he was entitled to three month's advance notice to quit, and that therefore, in view of the fact that farm leases generally run from March 1 to March 1 of the succeeding year, he should have been notified on December 1, 1945.

The evidence in the case discloses that the property in question, prior to 1942, was owned by one Dunton, who lost title to the land in 1942 by tax deed. Some of defendant's testimony indicates that he claimed an agreement with Dunton in the year 1922 creating a tenancy from year to year which had never been terminated. The record shows that defendant recognized the new owner in 1945 when he paid fifty dollars in cash for pasture rent to plaintiff Swanson's brother-in-law acting as her agent. Mrs. Swanson's agent wrote defendant under date of April 8, 1946, as follows:

"I am advised that you have began farming operations on NE-¼ - 1 - 6s - 50w.

"This land belongs to Mrs. Andrew Swanson, whom I represent. Mr. O. M. Swanson informs me that you paid cash rental of $50.00 for the use of this land last season, and your lease expired March 1, 1946. This land is leased to Wayne Moss for the season of 1946 and 1947.

"You are hereby notified to keep off this land hereafter, or will hold you liable for trespassing and damages."

Defendant further admitted that he knew the land went to tax deed in 1941 or 1942. Under the original Dunton agreement, according to defendant, the rental was "one-fourth delivered and the grass throwed in." Then, to use defendant's words, "In '45 Swanson come along and collected 50 dollars for pasture rent on it. Q. What did you figure you were buying when you paid this 50 dollars? A. I was buying the pasture on the quarter of land. Q. For how long? A. For the season."

The evidence is undisputed that defendant refused to farm the land and that he used it for pasture: "Q. Now, in 1945, you say you rented the ground? A. I give Swanson 50 dollars for it.

\* \* \*

"Q. That 50 dollars was supposed to pay for that? A. Pay for the lease on that land. Q. For when? A. '45. Q. That would be for the grass season of 1945? A. I told him I couldn't farm it, that I would have to pasture it. Q. That would be down to the customary time of March 1st, 1946, would you say? A. Well, whatever year you take it."

\* \* \*

"Q. Did you definitely arrange with him [Swanson] not to farm it the first year? A. Yes; I told him I couldn't farm it myself because I couldn't farm my own land, but I would give him 50 dollars for the pasture."

O. M. Swanson's testimony on direct examination is in part as follows: "Q. What happened, what discussion did you have? A. Why, he wanted to rent this land. Q. Go ahead and tell us what happened. A. He wanted to rent this land and I told him I thought he could rent it, but he didn't want to farm it. I told him I thought he could rent it for a hundred dollars, that I would okay it for a hundred dollars, but he said he wouldn't farm it. So I just let it go at that. Q. At that time were you representing your sister-in-law? A. Yes; I sent her money that she had coming."

Defendant testified that he did not get in touch with the owner in 1946, paid no rent, and admitted that after receiving the above quoted letter from Clarence M. Smith he made no effort to contact anyone with reference to renting the land or making a tender of rental.

■ ■ It would seem that the testimony introduced by both plaintiffs and defendant supports the theory that their agreement was not a tenancy from year to year, requiring a notice to quit, but was a simple payment of pasture rent for the 1945 season. This required

no affirmative act of the plaintiff to terminate any future relations, but, on the contrary, put the burden on defendant to obtain a lease for the 1946 season if he so desired. The applicable rule would seem to be that notice to quit is not required where, by the express words of the contract, the term is to end at a certain time. *Dulmaine v. Reed Bldg. Co.*, 46 Colo. 469, 104 Pac. 1038. It should also be noted that this lease, being an oral one, would be invalid under our statute of frauds, section 8, chapter 71, '35 C.S.A., had it run for a period of more than one year.

■■ The second point involves the question of damages covered by specifications numbers 3 and 4, and is to the effect that the court failed to properly instruct the jury, (a) on the measure of damages due from a tenant, and (b) concerning the loss of profits on the question of damages. The court's instruction No. 2 reads as follows: "You are instructed that if you find the issues herein enjoined [joined] in favor of the plaintiffs and you find from a preponderance of the evidence that the plaintiffs are entitled to damages, the measure of the plaintiffs' damage is the actual loss suffered by them by reason of having been deprived of the use of the land in question during the summer of 1946 and thereafter. In determining the amount of the damages, if any, you should ascertain the value of the use of the property on the basis of the production therefrom and the value of the crop thereon on the market with ordinary care in maturing, harvesting and marketing the same, considering the condition of the crop as shown by the evidence, and the yield of that part of the crop actually harvested and the average yield of such crops in the same season and locality on similar land under similar circumstances and then deduct from the total market value of the crop thus ascertained the ordinary and reasonable expense of planting, harvesting and marketing the entire crop and the amount so arrived at will be the amount of your verdict in favor of the plaintiffs."

It does not appear from the record that counsel for defendant at the trial objected to, or saved an exception to the giving of, this instruction. The evidence disclosed that about one-half of the 160 acres had been broken and planted to corn. The trial was had in October 1946, after the corn crop had matured. Defendant testified as to the value of crops which he raised, and plaintiffs' evidence consisted of the testimony of neighboring landowners as to the value and size of both corn and wheat crops in the neighborhood. As we said in *Colorado Nat. Bank v. Ashcraft,* 83 Colo. 136, 263 Pac. 23, "Sometimes lost profits may be considered in determining the damages sustained by a lessee who has been deprived of possession. *Gray v. Linton,* 38 Colo. 175, 88 Pac. 749." In the instant case it appears from the evidence that plaintiff had leased to Wayne Moss, who had been prevented by defendant's actions from taking possession of the land. Under all these circumstances, we cannot say that the verdict for $850 was excessive. The fact that the damages could not be ascertained with exact certainty is not a valid objection. *Denver v. Bowen,* 67 Colo. 315, 319, 184 Pac. 357.

■ The third point deals with specifications numbers 5 and 9, in which it is claimed there was a failure to instruct the jury on the preponderance of the evidence (5), and that there was an improper instruction on the preponderance of the evidence (9). The instruction given reads as follows: "The preponderance of evidence in a case is not alone determined by the number of witnesses testifying to a particular fact or state of facts. In determining on which side the preponderance of the evidence is, you should take into consideration the opportunities of the several witnesses for seeing or knowing the things about which they testify, their conduct and demeanor while testifying, their interest or lack of interest, if any, in the result of the suit, the probability or improbability of the truth of the several statements, in view of all the other evidence, facts and circumstances

proven on the trial, and from all these determine on which side is the weight or preponderance of the evidence. You should regard all surrounding facts and circumstances, and give credence to the testimony of the witness, or witnesses, you think the facts and circumstances warrant. In other words, the preponderance of the evidence does not consist alone in the greater number of witnesses testifying to a particular fact or state of facts, although you may take into consideration the fact of the greater number of witnesses being on the one side or the other in assisting you to determine where the preponderance or greater weight of the evidence is."

Counsel for defendant cites *Green, Admx. v. Taney,* 7 Colo. 278, 3 Pac. 423, and *Denver Tramway Co. v. Owens,* 20 Colo. 107, 36 Pac. 484, as authority for his contention that this instruction is improper. We do not so interpret those cases. In Green v. Taney we sustained a verdict in favor of Taney—who was the only witness in his behalf—against Green who, in addition to his own testimony, introduced that of eight other witnesses. In the instant case, the jurors seem to have believed the testimony of plaintiff Moss and the nine witnesses produced by plaintiffs, rather than that of the defendant on this phase of the matter. The record discloses ample grounds for their so doing, just as in the Green case there were sufficient grounds for the jury believing the testimony of Taney rather than that of Green and his eight witnesses.

■ ■ The fourth point deals with specifications 6, 7 and 10, alleging error in that the court did not instruct on the question of defendant's reputation; that it erred in its failure to exclude testimony regarding the financial responsibility of defendant, and in its failure properly to instruct the jury on the credibility of the witnesses. Evidence in regard to the reputation and financial responsibility of defendant was introduced in connection with the question of exemplary damages, which had been sought by plaintiffs in the amount of $10,000. By

its instruction No. 4 the court withdrew this issue from the jury. The instruction was given without objection, and no instruction as to the evidence on financial responsibility and reputation was tendered. The failure of the court to submit the question of exemplary damages to the jury did not prejudice the defendant.

Defendant did not object to the court's instructions on the preponderance of evidence or credibility of witnesses; no exception was saved by him to the giving of the instructions; nor were these points raised in the motion for new trial.

Evidence in regard to the reputation of defendant was admitted without objection.

█ Plaintiffs filed five cross specifications of points, the first three relating to the point that the court erred in giving instruction No. 4, withdrawing from the jury the question of exemplary damages. Under cross specifications of points 4 and 5 counsel argue the insufficiency of plaintiffs' awarded damages, urging that if their loss be computed on the basis of fifteen bushels of corn to the acre at a price of $1.75 per bushel, the value of the yield per acre would be $26.25, as against the jury's award of slightly over ten dollars per acre; that if the plaintiffs' damage is figured on a basis of a return from wheat, the yield for the 1946 season would make the gross value of the crop $35 per acre as against the jury's figure of a little over ten dollars per acre. On both these points we believe there is justification for the findings of the judge and the verdict returned by the jury.

The judgment is accordingly affirmed.

MR. CHIEF JUSTICE BURKE and MR. JUSTICE ALTER concur.