Opinion by CHIEF JUDGE LOEB
¶ 1 Plaintiff, Gail Gonzales, appeals the judgment for costs in favor of defendant, Kelli Windlan, in the amount of $15,253.77. We affirm.
I. Background and Procedural History
¶ 2 This case arises from a car accident on September 20, 2009, in which Windlan drove through an intersection without the right-of-way and struck a car driven by Gonzales. Gonzales brought suit against Windlan, asserting *881 claims of negligence and willful and wanton conduct and seeking damages for injuries allegedly caused by the accident. Gonzales later amended her complaint to assert only the negligence claim.
¶ 3 Before trial, Windlan admitted she was negligent and that her negligence was a cause of the accident. However, she asserted that Gonzales was also negligent and was partly at fault for the accident and Gonzales's resulting injuries. Windlan also disputed that all of Gonzales's claimed injuries and medical expenses were caused by the accident.
¶ 4 At a four-day jury trial in March 2013, Gonzales presented expert testimony from two treating physicians, Dr. Janssen and Dr. Shultz. These experts testified that Gonzales suffered a spine injury in the accident that required several years of treatment for pain and ultimately required surgery. They also testified that Gonzales was permanently impaired as a result of the accident.
¶ 5 Windlan presented expert testimony from Gonzales's primary care physician, Dr. Sayed, and a retained expert, Dr. Pitzer. Both experts testified that Gonzales suffered only a temporary muscle strain in the accident that resolved within a few months. Dr. Pitzer testified that Gonzales had a preexisting degenerative cervical condition at the time of the accident in 2009, which may have been caused by several previous car accidents or a slip-and-fall accident in 2008. He opined that much of Gonzales's pain and medical treatment, including the surgery, was not caused by the accident with Windlan.
¶ 6 In closing arguments, Gonzales asked the jury to find Windlan fully at fault for the accident and requested economic damages for medical expenses totaling $212,000, as well as substantial noneconomic damages for pain and suffering and damages for physical impairment. Windlan asked the jury to find the parties equally at fault. Windlan suggested that, if the jury reached the issue of damages, the jury should award damages only for a temporary muscle strain.
¶ 7 The jury found Windlan sixty percent at fault and Gonzales forty percent at fault for the accident. The jury awarded Gonzales $640 in economic damages and did not award any noneconomic damages or damages for physical impairment. The trial court reduced the verdict to $384 to reflect Gonzales's percentage of fault.
¶ 8 After trial, both parties moved for an award of costs. The trial court found Windlan to be the prevailing party and awarded costs to her in the amount of $15,637.77. After subtracting the amount of Gonzales's net jury award, the trial court entered judgment in favor of Windlan in the amount of $15,253.77. This appeal followed.
¶ 9 On appeal, Gonzales contends: (1) the trial court erred in allowing Dr. Sayed to testify as an expert about a 2009 MRI report; (2) the jury award of zero noneconomic damages was contrary to the evidence and inconsistent with the jury award of $640 for economic damages; and (3) the trial court erred in finding Windlan to be the prevailing party and awarding costs to her.
II. Dr. Sayed's Testimony
¶ 10 Gonzales contends the trial court abused its discretion in admitting Dr. Sayed's expert testimony about a radiologist's MRI report from October 2009. Specifically, Gonzales argues that (1) Dr. Sayed was not qualified to render an opinion on the MRI report and (2) Dr. Sayed's testimony was outside the scope of his occupational duties as a treating physician, and therefore improper testimony for a nonretained expert. We reject both arguments. We conclude that the trial court did not abuse its discretion in admitting the testimony and that, in any event, the admission of the testimony was harmless.
A. Background
¶ 11 Dr. Sayed became Gonzales's primary care physician in 2008. Gonzales visited Dr. Sayed the day after the car accident in September 2009 and again in February 2010. Gonzales originally disclosed Dr. Sayed, along with several other treating physicians, as nonretained experts in February 2012. The disclosure indicated Dr. Sayed would testify about his treatment of Gonzales and the records in her patient file.
*882 ¶ 12 Windlan deposed Dr. Sayed in April 2012. In the deposition, Dr. Sayed discussed the 2009 MRI report, which was part of his patient file for Gonzales. A different provider who had ordered the MRI sent a copy of the radiologist's report to Dr. Sayed because he was Gonzales's primary care physician. In the deposition, Dr. Sayed opined that the MRI report showed preexisting degenerative disc disease and did not indicate an acute injury. This deposition testimony supported Windlan's theory that the accident did not cause Gonzales's spine injury.
¶ 13 In February 2013, five weeks before trial, Windlan supplemented her expert disclosures to include Dr. Sayed as a nonretained expert. The disclosure stated that Gonzales had already disclosed Dr. Sayed as a nonretained expert and that "Dr. Sayed's opinions and basis for his opinions are as stated in his deposition of April 11, 2012."
¶ 14 Gonzales filed a motion in limine to strike Dr. Sayed as Windlan's expert and to exclude the deposition testimony. Gonzales argued that Windlan's supplemental disclosure was untimely, that Dr. Sayed's deposition testimony about the 2009 MRI report was "beyond the scope and limitations of a treating physician expert," and that Dr. Sayed was not qualified to offer an opinion on the MRI report. The parties briefed the issue and presented oral arguments to the trial court at a pretrial conference. At that conference, the parties disputed whether Dr. Sayed reviewed the MRI report in the course of treating Gonzales or reviewed it for the first time at the deposition. The court responded as follows:
I understand it's awkward when your expert doesn't give all of the opinions you would hope, and I can see how it may be awkward for your client as a patient. I'm not unsympathetic to that, but that doesn't really change the rules of what's admissible at trial.... [I]f [Windlan's counsel] had been asking opinions beyond the scope of those that could be given by a treating, as opposed to retained expert, if this had been a MRI that he didn't consider in the course of his treatment, I certainly [would not] have allowed him to start showing him things from other doctor's files and say, what do you think. [B]ut if this was part of his treatment and something he reviewed in the course of treatment, then, it's fair game. And if his opinions as to the causation or permanency of-of her injury when she [was] examined are not favorable to you, you're going to have to deal with it.
¶ 15 The court then issued a written order consistent with its statements at the hearing:
The court denies plaintiff[']s motion to strike and motion in limine regarding defendant[']s late expert disclosure and the proposed testimony of Dr. Khali [sic] Sayed. Dr. Sayed's expert testimony is related to his treatment of plaintiff and was disclosed during his deposition. The MRI is admissible if Dr. Sayed reviewed it for his treatment of plaintiff. It is inadmissible if Dr. Sayed reviewed it only for purposes of expert testimony. Dr. Sayed's thoughts about the permanency of her injuries is [sic] relevant and admissible. The court acknowledges that this ruling may be dependent upon the evidence elicited at trial and the trial judge could reconsider this order.
¶ 16 A different judge presided over the trial, and that judge essentially reiterated the previous judge's ruling before Dr. Sayed testified.
¶ 17 At trial, in explaining his expert qualifications, Dr. Sayed testified that he had practiced family medicine since 1990. He stated that, in the course of his practice, he regularly reviewed MRI reports prepared by radiologists. He testified that he relied on MRI reports to diagnose and treat patients, including patients with back and neck pain. The trial court accepted Dr. Sayed as an expert in family medicine.
¶ 18 Dr. Sayed then testified that he was Gonzales's primary care physician beginning in 2008. In September 2009, the day after the accident, Dr. Sayed examined Gonzales and diagnosed her with a temporary muscle strain. He testified that that type of strain typically resolved within six weeks. Dr. Sayed also testified that he received an MRI report from another provider later in 2009. He stated that Gonzales was seeing a specialist *883 at that time, and he generally did not interfere with a specialist's treatment of patients. However, he testified that he did review the MRI report and that he continued to treat Gonzales for back and neck pain in 2010.
¶ 19 Over Gonzales's objections, the trial court allowed Windlan to elicit testimony from Dr. Sayed about the MRI report that was consistent with his deposition testimony. Dr. Sayed confirmed that the MRI report showed a degenerative condition that was probably present before Gonzales's accident, and that it did not indicate an acute injury. He also testified that the findings in the MRI report were consistent with his own examination of Gonzales on the day after the accident.
B. Standard of Review
¶ 20 We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. Estate of Ford v. Eicher, 250 P.3d 262, 266 (Colo. 2011). A trial court abuses its discretion only if its ruling is manifestly arbitrary, unreasonable, or unfair. Huntoon v. TCI Cablevision of Colo., Inc., 969 P.2d 681, 690 (Colo. 1998).
C. Qualifications
¶ 21 We first reject Gonzales's contention that Dr. Sayed was not qualified to offer expert testimony about the MRI report.
¶ 22 CRE 702 governs the admissibility of expert testimony. People v. Shreck, 22 P.3d 68, 70 (Colo. 2001). Under CRE 702, a witness may be qualified to offer expert testimony based on any one of five factors: knowledge, skill, experience, training, or education. Huntoon, 969 P.2d at 690. "The initial determination of whether a witness is sufficiently qualified to render an expert opinion helpful to the jury is left to the sound discretion of the trial court, and may not be disturbed without a clear showing of an abuse of discretion." Id. (internal quotation marks omitted).
¶ 23 The record amply supports the trial court's ruling that Dr. Sayed was qualified to offer expert testimony about the MRI report. Dr. Sayed testified that he was a licensed medical doctor who had practiced family medicine for over two decades. He stated that he regularly reviewed and relied on MRI reports in the course of his practice. He also testified that he was familiar with the terms used by radiologists in MRI reports. This testimony clearly established that Dr. Sayed was qualified under CRE 702 to offer expert testimony on the MRI report.
¶ 24 Contrary to Gonzales's argument, Dr. Sayed's statement that he could not make a diagnosis directly from MRI films did not render him unqualified to opine on the MRI report. Dr. Sayed did not testify about any MRI films, and, thus, his qualification to do so was not at issue. He testified only about the radiologist's MRI report, and, as discussed, the record established that he was qualified to do so.
¶ 25 Likewise, the fact that Dr. Sayed was qualified as an expert in family medicine rather than radiology did not preclude him from testifying about MRI reports. "There is no requirement that a witness hold a specific degree, training certificate, accreditation, or membership in a professional organization, in order to testify on a particular issue," as long at least one of the CRE 702 factors is satisfied. Huntoon, 969 P.2d at 690 ; see also People ex rel. Strodtman, 293 P.3d 123, 129 (Colo. App. 2011) (discussing the prevailing rule that "otherwise qualified physicians or surgeons are not incompetent to testify as experts merely or necessarily because they are not specialists in the particular branch of their profession involved in the case" (internal quotation marks omitted)). Although he was not a radiologist, Dr. Sayed had the knowledge and experience to testify about MRI reports because he regularly reviewed and relied on them in the course of his medical practice. And, in fact, three other medical experts in this case testified about MRI films and reports without objection even though they were not radiologists.
¶ 26 For these reasons, we discern no abuse of discretion in the trial court's ruling that Dr. Sayed was qualified to give expert testimony about the 2009 MRI report.
*884 D. Occupational Duties
¶ 27 Gonzales next contends that Dr. Sayed's testimony was outside the scope of his occupational duties as a treating physician, and, therefore, was improper testimony for a nonretained expert. Gonzales argues that because Windlan did not disclose Dr. Sayed as a retained expert, his testimony should have been excluded. We conclude that Dr. Sayed's testimony was properly admitted as nonretained expert testimony.
¶ 28 C.R.C.P. 26(a)(2) governs expert witness disclosures. That rule distinguishes between experts "retained or specially employed to provide expert testimony" and nonretained experts. Nonretained experts are "occupational experts, such as treating physicians, police officers, or others who might testify as experts but whose opinions are formed as part of their normal occupational duties." Gall v. Jamison, 44 P.3d 233, 234 n. 2 (Colo. 2002). C.R.C.P. 37(c) provides for sanctions if a party fails to properly disclose expert testimony under C.R.C.P. 26(a)(2), including exclusion of the evidence at trial.
¶ 29 We conclude that Dr. Sayed's opinion about the 2009 MRI report was within the scope of his normal occupational duties. As noted, Dr. Sayed testified that he regularly reviewed and relied on MRI reports to diagnose and treat his patients. Gonzales concedes on appeal that Dr. Sayed reviewed the 2009 MRI report in the course of treating her. His review indicated that Gonzales had a preexisting degenerative condition rather than an acute injury. Thus, Dr. Sayed formed an opinion about the MRI report in his role as Gonzales's treating physician. We therefore conclude that his testimony about the 2009 MRI was properly admitted as nonretained expert testimony.
¶ 30 Accordingly, we also reject Gonzales's contention that Dr. Sayed's testimony should have been excluded under C.R.C.P. 37(c) because Windlan did not disclose him as a retained expert. Gonzales herself disclosed Dr. Sayed as a nonretained expert who would testify about his treatment of Gonzales and records in her patient file. His trial testimony about the 2009 MRI report was within the scope of that original disclosure. Thus, we discern no basis under C.R.C.P. 37(c) to exclude the testimony.
E. Harmlessness
¶ 31 Finally, we conclude that, in any event, the admission of Dr. Sayed's testimony was harmless.
¶ 32 The record shows that Gonzales had ample notice of Dr. Sayed's testimony about the MRI report. In his deposition eleven months before trial, Dr. Sayed expressed his opinion that the MRI report showed a preexisting degenerative condition rather than acute injuries. Five weeks before trial, Windlan supplemented her expert disclosures to indicate that she would call Dr. Sayed as a nonretained expert to testify about the opinions stated in his deposition.[1] Under these circumstances, Gonzales was not surprised or prejudiced by the testimony.
¶ 33 Moreover, all of the other expert witnesses at trial testified about the same 2009 MRI. Windlan's retained expert, Dr. Pitzer, testified that the MRI films and radiologist's report showed degeneration rather than acute injuries-the same opinion offered by Dr. Sayed. Both of Gonzales's experts offered the contrasting opinion that the MRI films showed acute injuries. Thus, Dr. Sayed's testimony was cumulative of Dr. Pitzer's testimony, and his opinion was rebutted by Gonzales's experts during her case-in-chief.
¶ 34 We reject Gonzales's contention that Dr. Sayed's testimony was a "tiebreaking vote" on the proper interpretation of the MRI. The weight of evidence is not necessarily determined by the number of witnesses testifying. Swaim v. Swanson, 118 Colo. 509, 514-15, 197 P.2d 624, 627 (1948) ; see also CJI-Civ. 3:12 (2012). Moreover, we are not persuaded that Dr. Sayed's testimony about the MRI "carried extra weight with the jury" because he was Gonzales's primary *885 care physician. To the contrary, Dr. Sayed was the only expert who did not base his opinion directly on the underlying MRI films. He admitted he was not qualified to interpret the films themselves, and his testimony was limited to interpreting the radiologist's report. Each of the other three experts offered detailed opinions based directly on the MRI films. Therefore, we reject Gonzales's argument that Dr. Sayed's testimony was so much more reliable or persuasive than that of the other experts that it changed the result at trial. See Core-Mark Midcontinent, Inc. v. Sonitrol Corp., 2012 COA 120, ¶ 29, 300 P.3d 963 (The decision to admit or exclude evidence is harmless unless it " 'substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.' " (quoting Bly v. Story, 241 P.3d 529, 537 (Colo. 2010) )).
¶ 35 Under these circumstances, we conclude that the admission of Dr. Sayed's testimony was harmless to Gonzales.
¶ 36 For all of these reasons, we discern no reason to reverse the judgment based on the admission of Dr. Sayed's testimony about the 2009 MRI report.
III. Noneconomic Damages Award
¶ 37 Gonzales next contends that the jury award of zero noneconomic damages was contrary to the evidence and inconsistent with the jury award of $640 for economic damages and, therefore, we should remand for a new trial on damages. We disagree.
¶ 38 "A reviewing court should overturn a jury verdict on damages only upon a showing that the jury's action was arbitrary and capricious or that the jury was swayed by passion or prejudice." Peterson v. Tadolini, 97 P.3d 359, 361 (Colo. App. 2004). Our supreme court has stated:
[When] the evidence is conflicting, a reviewing court should not disregard the jury's verdict, which has support in the evidence, in favor of its own view of the evidence. Rather, the court's duty is to reconcile the verdict with the evidence if at all possible. If there is any basis for the verdict, it will not be reversed for inconsistency.
Lee's Mobile Wash v. Campbell, 853 P.2d 1140, 1143 (Colo. 1993).
¶ 39 In Lee's Mobile Wash, the supreme court upheld a jury verdict of zero noneconomic damages, even though economic damages for medical expenses were admitted. Id. at 1140-42. The extent and nature of the plaintiff's injuries were hotly disputed at trial, and the court concluded that the jury could have found that the plaintiff's injuries were minor and did not result in compensable noneconomic damages. Id. at 1144.
¶ 40 We conclude that there was ample evidence to support the jury's award of zero noneconomic damages in this case. As in Lee's Mobile Wash, the nature and extent of Gonzales's injuries were hotly disputed at trial. Windlan's expert witnesses testified that the accident caused only a temporary muscle strain, which typically healed within a few months. Dr. Pitzer testified that this was the same type of injury that might result from routine activities such as shoveling a driveway. Dr. Pitzer also testified that "most people don't require medical attention" to treat a muscle strain. Based on this testimony, the jury could have determined that Gonzales experienced only a minor, temporary injury that did not cause compensable pain and suffering. See id. ; Steele v. Law, 78 P.3d 1124, 1127 (Colo. App. 2003) (upholding an award of zero noneconomic damages where the defendant's expert witness testified that the plaintiff's injuries after a low-impact car accident were "similar to the strain a sedentary person would experience after raking leaves in the yard").
¶ 41 Windlan also presented evidence that any pain Gonzales experienced was not caused by the accident. Windlan's experts testified that Gonzales's injuries were caused by a degenerative condition that originated before the car accident in 2009. Dr. Pitzer noted that Gonzales reported pain in the same area the year before the accident. Even Gonzales's experts admitted that a degenerative condition could cause symptoms like those Gonzales experienced, and they testified that the condition could occur naturally without an acute injury. Gonzales herself testified that she experienced back and neck pain after a previous car accident in *886 2001 and a slip-and-fall accident in 2008. Based on this testimony, the jury could have concluded that any pain following the 2009 accident was preexisting and not actually caused by the accident. See Steele, 78 P.3d at 1127 (upholding a jury verdict of zero noneconomic damages where the evidence showed that the plaintiff "suffered only very minor injuries from a low impact collision and that many of her medical and pain and suffering damages were not at all caused by the accident" (internal quotation marks omitted)). We therefore conclude that there is record support for the jury award of zero noneconomic damages.
¶ 42 We reject Gonzales's argument that the jury's decision to award zero noneconomic damages is inconsistent with its award of $640 for medical expenses. That figure corresponded to the amount billed by Dr. Sayed, Gonzales's primary care physician, for three visits-one on the day after the accident, and two more several months later. Based on the evidence at trial, the jury apparently concluded that it was reasonable for Gonzales to visit her family doctor the day after the accident, at which point she was diagnosed with a muscle strain, and to return for follow-up visits. Based on the evidence discussed above, however, the jury could also have concluded that the injury treated during those visits was so minimal that Gonzales did not experience compensable pain and suffering. See Lee's Mobile Wash, 853 P.2d at 1144. Thus, we conclude that the jury's award of zero noneconomic damages was not inconsistent with the award of $640 for medical expenses.
¶ 43 Gonzales's reliance on Peterson, 97 P.3d 359, and Martinez v. Shapland, 833 P.2d 837 (Colo. App. 1992), superseded by statute on unrelated grounds as stated in Miller v. Brannon, 207 P.3d 923 (Colo. App. 2009), does not compel a different result. In both cases, divisions of this court reversed a jury award of zero noneconomic damages where undisputed evidence from both parties showed that the plaintiff suffered significant injury and pain as a result of an accident. Peterson, 97 P.3d at 362-63 (undisputed evidence from both parties showed that the plaintiff experienced extreme pain after the accident, underwent a painful medical procedure, and spent six to seven weeks in a body cast); Martinez, 833 P.2d at 839 (both parties' experts testified that as a result of a car accident, the plaintiff developed a condition that caused pain with each movement of her jaw). In this case, as discussed, Windlan presented evidence that Gonzales's injuries were minor and temporary, and that any pain she did experience was not caused by the accident. Given these differing circumstances, Peterson and Martinez do not compel a reversal of the jury's verdict in this case.
¶ 44 Finally, we reject Gonzales's contention that Windlan's counsel admitted in closing argument that Gonzales incurred $10,000 in noneconomic damages.
¶ 45 "A judicial admission is a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." Kempter v. Hurd, 713 P.2d 1274, 1279 (Colo. 1986). Judicial admissions may be made by counsel during closing arguments. Larson v. A.T.S.I., 859 P.2d 273, 276 (Colo. App. 1993). However, the alleged admission must be unequivocal. Id. The statement must be considered within the context of the entire closing argument. See D.R. Horton, Inc.-Denver v. Bischof & Coffman Constr., LLC, 217 P.3d 1262, 1279 (Colo. App. 2009) ; Anderson v. Watson, 929 P.2d 6, 9 (Colo. App. 1996), aff'd, 953 P.2d 1284 (Colo. 1998).
¶ 46 We conclude that Windlan's counsel's statement was not an unequivocal admission when viewed in the context of the entire closing argument. Windlan's counsel made clear that Windlan disputed liability, causation, and the nature and extent of Gonzales's injuries. He asked the jury to find each party equally at fault, which would preclude Gonzales from recovering any damages. He argued that Gonzales's symptoms were caused by preexisting degenerative disc disease, and he reminded the jury of evidence showing that Gonzales experienced the same pain symptoms before the accident. Windlan's counsel then referred the jury to "question *887 four," the question on the verdict form pertaining to noneconomic damages. He stated: "I'm going to suggest if you were to ever reach question four that a good number for four would be ten thousand dollars for the pain, discomfort during this healing process from these strains." By comparison, Gonzales's counsel requested noneconomic damages between $25,000 and $2 million. In our view, when considered in context, this statement by Windlan's counsel was merely a suggestion to the jury that, if it decided noneconomic damages were warranted at all, it should award much less than the amount Gonzales requested.
¶ 47 Accordingly, we conclude that Windlan's counsel made no judicial admission regarding noneconomic damages in his closing argument. The jury was therefore free to ignore counsel's $10,000 suggestion and find that, based on the evidence at trial discussed above, Gonzales did not suffer any noneconomic damages.
¶ 48 For these reasons, we discern no basis to reverse the jury award of zero noneconomic damages.
IV. Prevailing Party and Award of Costs
¶ 49 Gonzales also contends that the trial court abused its discretion in finding that Windlan was the prevailing party and granting Windlan's motion for costs under C.R.C.P. 54(d).[2] We perceive no abuse of discretion.
¶ 50 Pursuant to C.R.C.P. 54(d), "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." For the purpose of awarding costs, a prevailing party is one who "prevails on a significant issue in the litigation and derives some of the benefits sought by the litigation." Archer v. Farmer Bros. Co., 90 P.3d 228, 230 (Colo. 2004). We review an award of costs for an abuse of discretion and will only disturb the award if it is manifestly arbitrary, unreasonable, or unfair. Id.
¶ 51 After trial, both parties moved for costs pursuant to C.R.C.P. 54(d).[3] Relying on Archer, the trial court awarded costs to Windlan in a written order based on the following reasoning:
This case was tried in a four day jury trial more than two years after the complaint was filed. Plaintiff sought $212,000.00 in economic damages alone. The jury found Plaintiff's economic damages to be $640.00. Additionally, the jury found Plaintiff had no noneconomic losses or damages for physical impairment. Finally, the jury found Plaintiff to be 40% at fault for the accident.
Under these circumstances, I find Defendant to be the prevailing party in this case.
¶ 52 We conclude that the record supports the trial court's finding that Windlan was the prevailing party. The significant issues contested at trial were liability, causation, and damages. The jury instructions stated Windlan's theory of the case as follows:
The defendant admits that she negligently entered the intersection without the right-of-way and admits that her negligence was a cause of the collision. The defendant also admits that plaintiff sustained some temporary muscle strain in the accident, but denies that the collision caused the neck conditions which were addressed by the June 2012 neck surgery, and denies that the plaintiff was permanently injured in the accident.
As an affirmative defense, the defendant claims that the plaintiff was traveling too fast for the congested traffic conditions at the intersection and negligently failed to observe the defendant's car as it was entering the intersection. The defendant claims that the plaintiff's negligence was a cause of the collision and any claimed injuries and damages.
*888 The jury's verdict generally aligned with Windlan's position on each contested issue. The jury found Gonzales was negligent and that her negligence was a forty percent cause of her own claimed injuries. The jury then awarded damages equal to the amount billed by the doctor who diagnosed Gonzales with a temporary muscle strain, consistent with Windlan's theory. The $640 economic damages award was far less than the amount Gonzales claimed for medical expenses, and the jury awarded no damages for noneconomic losses or physical impairment. Under these circumstances, we discern no abuse of discretion in the trial court's ruling that Windlan "prevail[ed] on a significant issue and derive[d] some of the benefit sought by the litigation." Archer, 90 P.3d at 230.
¶ 53 We are not persuaded by Gonzales's contention that Archer does not apply to single-claim cases, such as this one. Archer was a complex case with multiple claims against multiple defendants. Id. at 229. The supreme court reasoned that, in such cases, a trial court is in the best position to determine the prevailing party for purposes of awarding costs:
A trial court is given broad discretion to determine who is a prevailing party in multiple claim cases because of its unique opportunity to observe the course of the litigation. In multiple claim cases, where either party could arguably be considered the "prevailing party," the trial court is in the best position to evaluate the relative strengths and weaknesses of each party's claims, the significance of each party's successes in the context of the overall litigation, and the time devoted to each claim.
Id. at 231 (citations omitted).
¶ 54 We discern no reason why the standards and reasoning articulated in Archer should not apply where, as here, a case involves a single claim for relief but multiple contested issues. Archer itself does not state that the same analysis cannot apply to single-claim cases. Gonzales does not cite and we have not found any published appellate case in Colorado that would limit Archer in the way she argues, and we are persuaded otherwise.
¶ 55 In our view, the reasoning in Archer is equally suited to cases where, as here, multiple issues were contested and each party arguably prevailed in part. The verdict form in this case included six separate questions on the issues of liability, causation, and damages. The jury verdict reflected a mixed outcome on these issues. On one hand, Gonzales succeeded in recovering at least some economic damages for medical bills as a result of the accident. On the other hand, the jury found Gonzales partly at fault and awarded her minimal damages, consistent with Windlan's theory of the case. Thus, although there was only one claim, each party could arguably be considered the prevailing party. In this situation, as with multi-claim cases, we conclude the trial court is in the best position to determine "the significance of each party's successes in the context of the overall litigation" for purposes of awarding costs. Id.
¶ 56 Accordingly, we conclude that the trial court properly applied Archer to determine who was the prevailing party in this multi-issue case. As discussed above, given how the jury verdict largely aligned with Windlan's theory of the case, we discern no abuse of discretion in the trial court's ultimate determination that Windlan was the prevailing party.
¶ 57 We are not persuaded that Grynberg v. Agri Tech, Inc., 985 P.2d 59 (Colo. App. 1999), aff'd, 10 P.3d 1267 (Colo.2000), compels a different conclusion. In Grynberg, a division of this court concluded that the fact that the plaintiffs prevailed on only one claim in a multi-claim case and were awarded no damages did not automatically preclude a determination that they were the prevailing parties. Id. at 64. The division remanded the case to the trial court to apply the same basic standard stated in Archer : "the prevailing party is one that has succeeded on a significant issue and has achieved some of the benefits sought in the lawsuit." Id. As noted above, the trial court in this case appropriately applied that standard in determining that Windlan prevailed. We therefore conclude that the trial court's ruling is consistent with Grynberg as well as Archer.
*889 ¶ 58 Gonzales's reliance on Weeks v. City of Colorado Springs, 928 P.2d 1346 (Colo. App. 1996), is also misplaced. In Weeks, a division of this court concluded that the definition of "prevailing party" articulated in Dennis I. Spencer Contractor, Inc. v. City of Aurora, 884 P.2d 326 (Colo. 1994), for a contractual award of attorney fees applied to an award of costs under C.R.C.P. 54(d). Weeks, 928 P.2d at 1350. However, Weeks was decided prior to Archer, and another division of this court has subsequently held that the Spencer definition of "prevailing party" does not apply in personal injury cases. See Pastrana v. Hudock, 140 P.3d 188, 190-91 (Colo. App. 2006) (concluding that Weeks was inconsistent with Archer and declining to follow it in a personal injury case).
¶ 59 For these reasons, we conclude that the trial court did not abuse its discretion in finding that Windlan was the prevailing party and awarding costs to her.
V. Conclusion
¶ 60 The judgment is affirmed.
Ney* and Roy*, JJ., concur.

In his motion in limine, Gonzales argued to the trial court that this disclosure was untimely, but she does not renew this argument on appeal. Accordingly, we conclude that she has abandoned the argument, and we do not address it. See Armed Forces Bank, N.A. v. Hicks, 2014 COA 74, ¶ 38, 365 P.3d 378.

Gonzales does not challenge the amount of the trial court's award of costs.

Neither party requested the trial court to award costs under section 13-16-104, C.R.S. 2014, and neither party contends on appeal that the analysis of the costs issue is governed by that statute. Therefore, we do not address whether section 13-16-104 would entitle Gonzales to costs notwithstanding the trial court's discretion to determine the prevailing party under C.R.C.P. 54(d). See Pastrana v. Hudock, 140 P.3d 188, 191 (Colo. App. 2006).

Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5 (3), and § 24-51-1105, C.R.S. 2014.